IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CAROLYN S. BUSH,

      Plaintiff,

v.

                                 Civil Action No. 1:05cv7
                                        (Keeley)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Carolyn S. Bush ("Plaintiff") filed her application for SSI on October 7, 1996 (protective filing date), alleging disability beginning March 22, 1995, due to arthritis, joint pain, and precancerous cells of the cervix (R. 210). The application was denied initially and on reconsideration (R. 172, 174). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Edward J. Banas held on May 19, 1999 (R. 93). Plaintiff, represented by counsel, testified on her own behalf, along with Vocational Expert Lisa Jenkins ("VE"). By decision dated July 26, 1999, the ALJ denied benefits (R. 75). Plaintiff filed a request for review of the hearing decision,

which was granted by the Appeals Council on August 24, 2001 (R. 47). The Appeals Council vacated the ALJ's decision and remanded the case to an ALJ with instructions. ALJ Banas held a second hearing on March 12, 2002 (R. 131). Plaintiff, represented by counsel, testified along with VE Larry Bell. The ALJ issued a decision on August 20, 2002, again finding Plaintiff not disabled (R. 23). The Appeals Council denied Plaintiff's request for review on November 9, 2004, rendering the ALJ's decision the final decision of the Commissioner (R. 10).

## II. Statement of Facts

Plaintiff was born on August 21, 1950, and was one day shy of 52 years old at the time of the second ALJ's decision (R. 38). She completed the eighth grade and obtained her GED and has approximately four weeks of past work as a store stock person (R. 263).

On March 29, 1996, Plaintiff underwent a heart catheterization for evaluation of chest pain and positive thallium stress test (R. 269). Testing showed no significant coronary artery disease. Plaintiff had normal left ventricular systolic function and normal circumflex coronary artery. She was diagnosed with chest pain, non-cardiac, and false positive thallium test. The cardiologist concluded Plaintiff's chest pain was "most likely musculoskeletal or gastroesophageal reflux disease."

Plaintiff underwent a cone biopsy of the cervix on April 12, 1996 (R. 276). The diagnosis was CIN-III, rule out invasive cervical carcinoma. The specimen revealed carcinoma in situ with no histologic evidence of microinvasive or frankly invasive disease. All margins of the specimen were negative for disease. Plaintiff healed well (R. 361).

On December 6, 1996, Plaintiff was examined by Charles M. Paroda, D.O., Ph.D., at the request of the State agency (R. 305). Plaintiff complained of joint pain. Examination showed

2

Plaintiff was 5'2" and 183 pounds (R. 306). She ambulated with a normal gait and did not require a cane. She was comfortable standing, sitting, and supine. Her mental state appeared to be normal and her intellectual functioning appeared normal. Her extremities showed no clubbing, cyanosis, or edema. Palpation of the shoulders, elbows, wrists, hands, hips, knees, ankles, and feet revealed no swelling, tenderness, redness or warmth. "The only physical finding in any of her joints or extremities was that her knees showed some crepitus with range of motion." Spinal curvature was normal. Palpation and percussion of the spinous process revealed no tenderness. Palpation of the paravertebral muscles revealed no tenderness, swelling or redness. Plaintiff could do straight leg lifts to 90 degrees bilaterally, but had a little discomfort in her right lower back area. The cervical spine had normal range of motion without any restrictions. The lumbar spine had normal range of motion without any discomfort. The extremities had normal range of motion without any restrictions. Motor strength was equal bilaterally in both lower and upper extremities. Grip strength was equal bilaterally. There was no sign of atrophy or wasting. Reflexes were equal. Plaintiff could walk on her heels, toes, and heel to toe, and stand on one leg without difficulty. "When she squatted she got down too far, and she had to get on her knees to get back up again." Plaintiff could write her name, pick up coins, and perform fine manipulative testing.

Dr. Paroda found that Plaintiff might have a chronic low back strain and "a little bit of mild arthritis, but nothing that appears to be debilitating at this time." He noted she was "a little overweight and this would contribute somewhat to some of the discomfort in her lower extremities." He diagnosed joint pain, rule-out arthritis, and chronic low back strain (R. 308).

On December 10, 1996, State agency reviewing physician Hugh M. Brown completed a Residual Functional Capacity assessment ("RFC") opining that Plaintiff had no physical limitations

(R. 314).

Plaintiff underwent a dilatation and curettage ("D&C") on January 9, 1997 (R. 324). It revealed no premalignant or malignant tissue (R. 368). She was found to have no clinical evidence of recurrent disease.

On March 26, 1997, State agency reviewing physician Fulvio Franyutti, M.D., completed an RFC, opining Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 351). She was limited to frequent climbing, balancing, stooping, kneeling, crouching, and crawling. She must avoid concentrated exposure to temperature extremes (R. 354). Dr. Franyutti concluded that Plaintiff's RFC should be reduced to medium based on complaints of pain and reduced range of motion (R. 356).

On May 13, 1997, Plaintiff was examined for the State Department of Health and Human Resources ("DHHR") by her treating physician's office (R. 444). Her "Statement of Incapacity/Disability" was: "I have back pain that goes down my legs." The doctor noted Plaintiff weighed 185 pounds. Her speech was clear, and her posture and gait were normal. The only abnormalities he found were mild, mostly superficial varicose veins, a mild sensory deficit in the right leg, and mild spinal tenderness with positive straight leg raises on the right at 45 degrees. Plaintiff described lower back pain as sharp and dull. She required assistance to arise. The pain radiated to her right leg with numbness and paresthesia. Her pain was usually controlled with Motrin 800. The diagnosis was chronic low back pain with sciatica, with a minor diagnosis of depression, migraine headache and status post cervical cancer. The doctor opined Plaintiff was able to perform full time work in "sedentary positions" not requiring extensive stooping, bending, lifting, etc. She

4

would be unable to sit or stand for extended periods of time due to back pain. He also found she could work at the light exertional level.

Plaintiff had another physical examination at the request of DHHR on February 25, 1998 (R. 448). It was again performed by a medical provider in Dr. Given's office. Plaintiff's Statement of Incapacity/Disability at this time was "my knees hurt so bad I can't walk" and "I also have cervical dysplasia." Her weight was 179 ½ pounds. Her speech, posture, and gait were again normal. Her physical examination was entirely normal. She described her pain as "pain in knees hurt w/long period of standing and excessive walking." (R. 449). Her diagnosis was mild osteoarthritis of the knees bilaterally and cervical dysplasia. The doctor found she would be able to work full time at her customary occupation or like work, or other full time work. She was limited to work at the moderate (50-25 lb. level), avoiding heavy lifting.

Plaintiff presented to her treating physician's office in January 1999 for complaints of a sore left heel (R. 452). She said she had sharp left heel pain with weight-bearing for three weeks and she now had to walk on tip-toe. Upon examination, her left heel was tender with no sign of infection. She was diagnosed with a left heel spur and given an injection.

On February 2, 1999, Plaintiff still had left heel pain, sore up to her ankle (R. 452). An x-ray performed that day showed a left calcaneal spur (R. 484). Plaintiff's podiatrist opined Plaintiff's prognosis was good, stating "This is not an incapacitation problem in my judgment," and "I have never had anyone incapacitated from this problem. As long as patient follows up with my appointments I don't see any employment limitations." (R. 508).

On March 19, 1999, Plaintiff was examined by psychologist John R. Atkinson, Jr. at the request of her counsel, "to help determine her eligibility for Social Security Disability Benefits" (R.

456). She was brought to the office by her boyfriend. When asked to describe her disability, Plaintiff stated:

> [I] have trouble with my knees, hips, can't lift anything heavy. High cholesterol bothers me and causes me to be dizzy if I eat the wrong thing (?)[sic], on medicine for it. When I have my monthly period, I have to stay home for three days and can't go out. Shortness of breath, back problems, something with my left arm now, my elbow hurts and can't lift anything with it. A bone spur with my left foot, at times I can't hardly walk, migraine headaches.

Plaintiff described her typical, average day as:

> Get up at six o'clock, fix the fire, we have wood heat. Pack my son's lunch and get him off to work, fix breakfast for me and my boyfriend. Do the dishes, walk around, sit down, odds and ends through the daytime. TV in the afternoon, at three o'clock soap operas are on. Fix supper at four o'clock, my son comes home, do the dishes. In the evening, sit around and talk, bed about eight o'clock.

She stated she did not attend church, had no hobbies, and did not visit friends (although friends visited her on weekends). She visited relatives once or twice a week and her daughter visited her on weekends. Plaintiff cooked, washed the dishes, did the general housecleaning, and did the laundry. She engaged in no entertainment outside the home. She liked reading mystery novels, detective magazines and the newspaper. She also spent time with her granddaughter. She had no difficulty shopping or handling money, and had a driver's license she obtained through written exam.

Dr. Atkinson noted one medical report that mentioned "too many problems to list" (R. 458). She appeared "somatically focused and makes frequent doctor visits." She had never been formally treated for emotional, behavioral or mental problems, but was treated by her general physician for depression. She was taking Paxil and Zocor. She was supposed to be taking Hydroxysine, metoprolol,[1] Premarin, Progesterone, Cimetadine, and Ibuprofen, but stated she could not afford

---

[1]Used in the treatment of angina pectoris and hypertension. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 1147 (30th ed. 2003).

them.

Plaintiff was currently living with her boyfriend, age 43, who was disabled and on SSI due to back problems (R. 459). She described him as "the greatest guy that ever walked." Their relationship had been great for the past 19 years, but she did not want to get married. Her 21-year-old son also lived with them.

Plaintiff attended public school to the eighth grade, when she quit to take care of her father (R. 459). She had had a poor attendance record and repeated the first and fourth grades, but was never in special education and made average to above-average grades.

Upon mental status examination, Plaintiff's presentation was alert, calm, business-like and cooperative (R. 460). She was clean and appropriately dressed. Her attention span was "tenacious" and psychomotor activity was slightly increased. Speech patterns were coherent but somewhat terse and to the point and pace of speech was rapid. Ability to calculate was unimpaired, and ability to abstract was mildly impaired. Her affect was generally within normal limits and appropriate. She said her mood was normal and indicated that was her usual mood. She had wide mood swings with PMS only, but had some emotional lability consisting of crying spells when upset.

Plaintiff reported onset of depression during her marriage in her early adulthood. She said she felt depressed a lot and "down in the dumps." She felt agitated about once or twice a month, and reported situational apprehension when at home alone. She denied any other anxiety or panic attacks. She did appear psychasthenic, tense, jittery and nervous. She reported occasional temper problems and a low energy level with frequent draining fatigue. She denied suicidal or homicidal ideation, psychotic thinking, obsession, compulsion, delusion, hallucinations, paranoia, phobias, fears or other symptoms of mental disorder other than fear of being left alone.

7

Dr. Atkinson found Plaintiff well oriented. He found her memory was broadly intact, although she complained of forgetfulness. Plaintiff reported her sleep patterns were marked by incessant, intermediate awakening and she had poor eating patterns.

Plaintiff's IQ tested at 84 verbal and performance and 83 full scale on the WAIS-R, or "dull/normal" (R. 461). She read at the 7th grade level and did math at the 5.9 grade level.

Personality testing clinical scales were all within normal limits except for a mild elevation on the hypochondriasis scale, indicating a profile that tended toward somatic concerns, hypochondriasis, and psychophysiological disorder. Dr. Atkinson diagnosed Dysthymic Disorder, Provisional; Undifferentiated Somatoform Disorder; and Hysteroid Personality Traits, and rated her GAF at 60[2] (R. 462-463). He found she would have a "poor" ability to deal with work stresses, function independently, and understand, remember, and carry out complex job instructions (R. 467-468). He completed a Psychiatric Review Technique opining Plaintiff had an affective disorder and somatoform disorder, but that she had only slight restriction of activities of daily living, slight difficulties in maintaining social functioning, and seldom experienced deficiencies of concentration, persistence or pace.

On April 21, 1999, Plaintiff presented to orthopedic specialist Joseph Snead, M.D. for evaluation of her knees, hips, and ankles (R. 486). On examination, the right knee showed some slight varus deformity and some medial joint line ridges. The left knee was tender, but with no deformity. Both knees had full range of motion. A radiologist found x-rays showed no bony

---

[2]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

abnormalities of the knees and hips, but Dr. Snead opined the x-rays revealed significant medial compartment osteoarthritis on the right side and diagnosed osteoarthritis of both knees, right worse than left. He opined she could not do any work that involved standing, climbing, squatting or stooping, and was confined to sedentary to light-type work. He believed she might need knee replacement in 10 years, but might respond to Synvisc injections.

On May 21, 1999, the State DHHR found Plaintiff disabled (R. 490).

On August 5, 1999, Plaintiff presented to the ER with complaints of numbness of the left side of her face, then trouble speaking (R. 492). The numbness resolved over the next several weeks. She was diagnosed with headache, numbness, and anemia (R. 496). She was scheduled for a CT scan of the head, which indicated mild central and cortical atrophy but no radiographic evidence for acute intracranial pathology (R. 502).

A barium enema performed in August 1999 showed multiple small diverticula (R. 502).

On May 16, 2000, Plaintiff was evaluated for pneumonia (R. 503). Chest x-rays showed no acute pulmonary infiltrate.

Plaintiff presented to her treating physician's office on July 5, 2000, for complaints of joint pain throughout her body, but especially the right knee. She "gets relief with Ibuprofen." She told the doctor that Dr. Snead said she needed knee replacement. The diagnosis was depression, abnormal vaginal bleeding, and Degenerative Joint Disease ("DJD")(R. 541).

In October 2000, Plaintiff was referred by counsel for a second psychological evaluation, this time performed by James V. Battisti, supervised by L. Andrew Steward, Ph.D. (R. 523). The reason for the evaluation was "to assess her current level of functioning as it pertains to the appeal of her Social Security disability claim." On this date, Plaintiff stated:

9

> [M]y knee joints are completely worn out, they want to replace them . . . . I have heavy menstrual periods . . . . I had seven D & C's done in the last two years . . . . I am in pain, my knees, my back . . . . I have heart problems.

(R. 523). Upon testing, Plaintiff's IQ score was between 74-76, at the borderline range of intellectual functioning (R. 525). She read at the high school level, spelled at the 7th grade level, and did math at the 6th grade level. Personality testing was not considered valid (R. 526). The Beck Depression Inventory indicated a "moderate range" of depression.

Dr. Battisti diagnosed Pain disorder, Mood disorder with depressive features, Anxiety disorder with generalized anxiety, Borderline intellectual functioning, and assessed her GAF as 55 (R. 527). The doctors completed a PRT opining Plaintiff had an organic mental disorder, schizophrenia, paranoid or other psychotic disorder, affective disorder, anxiety disorder, somatoform disorder, and personality disorder. They opined she would have "marked" limitations of activities of daily living, "marked" difficulties in maintaining social functioning, "often" have difficulties in concentration, persistence or pace, and had once or twice had episodes of deterioration or decompensation in work or work-like settings (R. 535). She would be markedly limited in her ability to work in coordination or proximity to others without being unduly distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. She would be moderately limited in her ability to remember work-like procedures, understand, remember, and carry out detailed instructions, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without supervision, accept instruction and respond appropriately to criticism from supervisors, travel in

unfamiliar places or use public transportation, or set realistic goals or make plans independently of others.

On April 24, 2001, Plaintiff presented to her doctor for complaints of arthritic pain, especially of the right knee, getting worse for the past two weeks (R. 555). She said it turned blue at night and swelled.

On December 14, 2001, Plaintiff presented to orthopedist Snead on referral from her treating physician, for her right knee pain (R. 559). Dr. Snead reviewed an MRI, noting he did not see much there from a mechanical standpoint. The medial meniscus was significantly thinned, but he did not see a tear. The knee went only to 90 degrees of flexion. Dr. Snead diagnosed symptomatic osteoarthritis and prescribed Vioxx (R. 559).

Dr. Snead filled out a questionnaire, opining that Plaintiff had arthritis of the knees (R. 562). He found she had a history of joint pain and gross anatomical deformity of a major weight bearing joint along with markedly impaired ability to ambulate, thus meeting current Listing 1.03. He could not opine whether she met a listing on or before October 7, 1996, because he had not seen her before 1999 (R. 564).

In January 2002, Plaintiff's treating physician, Dr. Given, opined Plaintiff could work only at the sedentary level (R. 569). She could stand and walk for two hours at a time. She would need to alternate positions frequently due to back pain. She could infrequently climb, stoop/bend, kneel, crouch, crawl, and squat, and could occasionally balance, stretch and reach. She was restricted around machinery and environmental hazards. It would be advisable for her to recline or lie down during the day with her feet up and it would be "advisable or necessary" for her to have frequent rest periods sitting during the day (R. 570). She would be expected to experience chronic mild to

moderate pain, and intermittent severe pain. She did not need a cane. Dr. Given concluded Plaintiff could work full time at a sedentary job (R. 572). The "specific barriers to employment from a medical standpoint" were stated as "education" and "depression" (R. 573). He also opined she had a mental impairment that in combination with her other impairments resulted in a greater degree of disability than the physical or mental impairment alone would indicate. He opined the degree of severity of her impairments would have been the same on March 1995 or October 1996, but was uncertain whether she was disabled from all full-time work on March 22, 1995 or October 1996.

Plaintiff underwent a third psychological evaluation upon referral from her counsel in January 2002, again performed by L. Andrew Steward, Ph.D., supervising Wilda Posey, MA (R. 574). On this occasion, Plaintiff stated she was applying for benefits because of osteoarthritis (R. 574), stating she was "crippled up" and needed an operation on her right knee as well as both hips. She also reported seeing her dead father over the past year (R. 575).

Plaintiff reported her daily activities as arising at 5 a.m. and retiring at 8 p.m. (R. 582). She had nightmares three times a month. She had trouble staying asleep and had loss of appetite. She did not attend church. Her daily activities included doing laundry, cooking, and taking care of the wood stove, including getting the wood from the porch. She enjoyed reading, and spent a lot of time watching television during the day. She denied any current hobbies or special interests, but did spend time with her granddaughter.

Mental Status Examination showed Plaintiff was appropriately dressed, with hygiene and grooming within normal limits. She maintained good eye contact and was alert and calm, cooperative and polite with all staff. Speech was relevant, coherent, and spontaneous. She was fully oriented. She reported being nervous, and described her mood as "okay." Her observed mood was

12

neutral, her affect was broad, and her psychomotor activity was slightly increased.

The psychologist found Plaintiff's thought processes were within normal limits, with no delusions, illusions, preoccupations or phobias. She seemed somewhat obsessive regarding checking the wood stove, windows and doors. Someone in her neighborhood had been murdered and she felt very fearful about being home alone, but denied any paranoia. She did report hallucinations in seeing her dead father two or three times and her "ex" once. She did not have a conversation, but said the dead spoke to her. Her judgment appeared mildly deficient based upon testing. Immediate, recent and remote memory were within normal limits and insight was fair. Results appeared to be valid.

Plaintiff obtained IQ scores between 74 and 83, placing her in the borderline range (WAIS-III). (R. 583). She read and performed math at the 7th grade level and spelled at the 3rd grade level (R. 584)

The Beck Depression Inventory indicated mild depression (R. 584). The Beck Anxiety Inventory indicated severe anxiety.

Personality testing was considered valid. Her scores indicated an individual with somatic complaints likely to be chronic, accompanied by fatigue and weakness, tending to render the individual incapable of performing even minimal expectations. The psychologist opined that such individuals tended to be resistant to psychological explanations for their problems. The anxiety scale indicated an individual who tended to express anxiety in physical symptoms. Her depression scale was also elevated.

The diagnosis was Undifferentiated Somatoform Disorder; Dysthymic Disorder, late onset, with atypical features, by history; and Borderline Intellectual Functioning. Her current GAF was 60

(R. 585).

The psychologists opined Plaintiff would not be markedly limited in any functional area. She would be moderately limited in her ability to understand, remember and carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, be aware of normal hazards and take appropriate precautions, and set realistic goals and make plans independently of others. She would have a poor ability to function independently and demonstrate reliability (R. 590).

The psychologists completed a PRT finding Plaintiff had an affective disorder and somatoform disorder (R. 591). She would have no restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation (R. 601).

On March 18, 2002, Dr. Snead wrote a letter to counsel, stating that his diagnosis of osteoarthritis of the knees was based on his own reading of the x-rays, and he could not comment on the radiologist's interpretation of the x-rays (R. 605). He found Plaintiff had significant loss of joint space on the right side. Apparently the left was more normal and the osteoarthritis diagnosis in the left knee was based on clinical findings.

### Evidence Submitted to the Appeals Council

On July 5, 2000, a nurse practitioner in treating physician's office examined Plaintiff for the State DHHR (R. 506). Her speech, posture, and gait were all normal. She opined Plaintiff had

14

Depression, Degenerative joint disease of the knees, Hyperlipidemia, and abnormal vaginal bleeding. She opined Plaintiff could work full time with limited lifting or weight bearing. In particular, Plaintiff could work at the light level, avoiding only heavy lifting and weight bearing (R. 507).

On December 3, 2001, Plaintiff saw orthopedist Dr. Snead for her knees (R. 616). Physical examination revealed medial joint line ridges on the right knee, some crepitating and grinding with motion, and slight tibia vera deformity. Dr. Snead opined that x-rays revealed medial compartment osteoarthritis.

On January 30, 2002, Dr. Snead noted Plaintiff had a mild tibia vara deformity with normal ROM but walked with a slight limp (R. 617). He diagnosed medial compartment osteoarthritis and fitted her with a medial compartment unloading brace. Dr. Snead reported to the State DHHR that Plaintiff's prognosis was poor. Her employment limitations were unknown but he expected them to be permanent (R. 618).

On February 21, 2002, Plaintiff presented to Dr. Givens' office with complaints of right arm pain from the elbow to the fingers, described as a tearing, sharp pain, worsening over the last three days (R. 633). It hurt when she clenched her fist. Plaintiff stated Dr. Snead told her she had rheumatoid arthritis. She also complained of "pins and needles" in her 2nd and 3rd fingers. She had a positive Tinel's sign on the right. Sensation was intact. She was diagnosed with right carpal tunnel syndrome, questionable rheumatoid arthritis, and hypertension.

On June 3, 2002, Dr. Given completed a third physical of Plaintiff for the State DHHR (R. 623). He noted her gait was altered due to a knee brace. She had edema of the right knee. He stated his diagnosis as osteoarthritis of the knees, DJD, hypertension, GERD, hyperlipidemia, and depression (R. 624). He found she was unable to stand "for periods of time," and would not be able

15

to perform full time work due to generalized DJD, especially of the knees. He noted knee replacement surgery may be necessary in future, and opined she could not squat or bend over. He opined Plaintiff could perform sedentary work avoiding lifting, squatting, and excessive walking. She would never be able to work full time, however.

On September 11, 2002, Plaintiff reported no new problems to Dr. Given (R. 634). She was doing well, although she still had knee and carpal tunnel syndrome pain. She was reporting daily heart palpitations. She had sharp pain on inspiration associated with palpitations at times.

By October 2002, Plaintiff was no longer reporting palpitations (R. 635). In December 2002, she was "doing fine" (R. 638). She had no chest pains, palpitations or syncope. She was diagnosed with GERD, increased cholesterol, and depression.

On May 7, 2003, Plaintiff reported still having arthritis pain, but said Salsalate helped (R. 641). She had a positive ANA test.

On September 24, 2003, Rheumatologist Jo Ann Hornsby diagnosed "diffuse discomfort most consistent with fibromyalgia" (R. 651). She opined Plaintiff had "fibromyalgia tender points at all sites." She noted Plaintiff also appeared to have osteoarthritis in the knees.

Also in September 2003, Dr. Givens performed another State DHHR exam (R. 660). He noted Plaintiff's gait was antalgic. He opined she would not be able to do her regular job. She would also not able to perform other full time work because she was "not educated past GED level" (R. 661). She should avoid lifting. He noted the duration of her inability to work was one year.

In October 2003, Dr. Hornsby noted Plaintiff had multiple tender points and a positive ANA test. She diagnosed probable fibromyalgia and osteoarthritis of the knees (R. 653).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has arthralgias, chronic low back strain, osteoarthritis of the right knee, and history of abnormal uterine bleeding, impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 416.927).

6. The claimant has the following residual functional capacity: she is able to perform the demands of light work with certain modifications. She must be allowed to sit or stand at will during the workday. She is limited to simple, routine, repetitive jobs.

7. The claimant has no past relevant work (20 CFR § 416.965).

8. The claimant is currently an 'individual closely approaching advanced age.' On her alleged onset date the claimant was a "younger individual" (20 CFR § 416.963).

9. The claimant is functioning at the " limited education" range (20 CFR § 416.964) with marginal achievement, but she is able to read and write.

10. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

11. Although the claimant's limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.17 and 202.10 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as assembler and hand packer.

12. The claimant was not under a "disability," as defined in the Social Security Act,

at any time through the date of this decision. (20 CFR § 416.920(f)).

(R.27).

## IV. The Parties' Contentions

Plaintiff contends:

1.      All of the errors alleged essentially stem from the ALJ's failure to weigh the evidence of record by the proper regulatory factors of 20 C.F.R. 416.927(d) and (e), SSR 96-2p, SSR 96-5p.

2.      The ALJ's finding that no Listing is met or equaled lacked substantial evidence, when he gave no weight to orthopedist Snead's opinion that Ms. Bush's right knee arthritis met Listing 1.03 and failed to recontact Dr. Snead for clarification of the questionnaire dated 1/29/02.

3.      The ALJ's finding lacks substantial support when the ALJ failed to uphold the opinion of treating physician Dr. Given that claimant was restricted to sedentary activity.

4.      As a corollary to No. 3, the ALJ failed to find that Ms. Bush met the Grids at age 50.

5.      The finding that the Plaintiff had no severe mental impairment is not supported by substantial evidence and is in violation of 20 C.F.R. 416.927(d).

6.      The ALJ failed to include specific mental limitations in the RFC, in violation of SSR 96-8p and 20 C.F.R. 416.945(c).

7.      The ALJ relied upon an incomplete, inadequate hypothetical question that did not include the specific mental limitations or the need to recline and take frequent rests.

Defendant contends:

1.      The ALJ properly evaluated and weighed the evidence of record in determining Plaintiff's RFC.

2.      The ALJ was not required to re-contact Dr. Snead and Dr. Snead did not opine that Plaintiff met Listing 1.03.

3.      The ALJ properly attributed limited weight to Dr. Given's opinion that Plaintiff was restricted to sedentary work.

4.      The ALJ properly determined that Plaintiff's mental impairment was not severe.

18

5.     The hypothetical question to the VE included all of Plaintiff's limitations.

## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Dr. Snead's Opinion that Plaintiff met Listing 1.03

Plaintiff argues the ALJ's finding that no Listing is met or equaled lacked substantial evidence, when he gave no weight to orthopedist Snead's opinion that Ms. Bush's right knee arthritis met Listing 1.03 and failed to recontact Dr. Snead for clarification of the questionnaire dated 1/29/02. Defendant contends the ALJ was not required to re-contact Dr. Snead and Dr. Snead did not opine that Plaintiff met Listing 1.03. Instead, Defendant contends "Dr. Snead specifically wrote in his assessment that it was 'unknown'" to him whether Plaintiff meet [sic] listing 1.03 (Tr. 564)."

Defendant's interpretation of Dr. Snead's opinion is clearly incorrect, however. Dr. Snead "specifically wrote" only that it was unknown to him whether Plaintiff met listing 1.03 "**on or before 10/7/96, or as early as 3/22/95,**" because he had only treated Plaintiff since April 1999 (R. 564) (emphasis added). He clearly did opine she met all the requirements of Listing 1.03 as it was written in January 2002. At that time, Listing 1.03 required, in pertinent part:

> *Arthritis of a major weight-bearing joint (due to any cause)*:

> With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination.

> With:

> A. Gross anatomical deformity of hip or knee (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand . . . .

As the ALJ correctly noted, the musculoskeletal listings were amended effective only a few months after Dr. Snead proffered his opinion, and Plaintiff would not meet Listing 1.03 as amended. The ALJ then analyzed Plaintiff's osteoarthritis of the knee under (new) Listing 1.02, which requires:

> *Major dysfunction of a joint(s) (due to any cause)*: characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s),

> With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

The main difference between the two Listings is the difference between the impairment "markedly

limiting ability to walk and stand" versus the impairment "resulting in inability to ambulate effectively, as defined in 1.002B."

Social Security Regulation ("SSR") 96-5p provides, in pertinent part:

Requirements for Recontacting Treating Sources

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

The undersigned has not often required the ALJ to recontact the treating physician under this Regulation, because he generally finds the adjudicator was able to ascertain the basis of the opinion from the case record. Here, however, the undersigned finds the ALJ could not clearly ascertain the basis of Dr. Snead's opinion that Plaintiff met a Listing, if only because the Listing itself had changed only a few short months after he rendered the opinion. The undersigned believes Dr. Snead should be given the opportunity to explain whether he is of the opinion that Plaintiff met the Listing as revised (1.02), and the basis for that opinion.

The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff did not meet a Listing. This is not to say that Plaintiff does meet or equal any Listing, but only that her treating orthopedist should be heard, if possible, regarding Listing 1.02.

### C. Dr. Given's Opinion that Plaintiff was Limited to Sedentary Work

Plaintiff next argues the ALJ's finding lacks substantial support because he failed to uphold the opinion of treating physician Dr. Given that she was restricted to sedentary activity. Defendant contends the ALJ properly attributed limited weight to Dr. Given's opinion that Plaintiff was restricted to sedentary work. There is no dispute that Dr. Given is a treating physician. In *Craig v.*

*Chater*, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

On July 5, 2000, Dr. Given's office opined that Plaintiff could work at the light exertional level (R. 506). On April 24, 2001, Plaintiff present to Dr. Given's office with complaints of arthritic pain, especially of the right knee, getting worse for the past two weeks (R. 555). Dr. Given referred her to orthopedist Snead. On December 14, 2001, Dr. Snead stated he did not see much on the MRI "from a mechanical standpoint." He noted the medial meniscus was significantly thinned, but did not see a tear. The knee went to only 90 degrees of flexion. In January 2002, Dr. Given opined Plaintiff could work only at the sedentary level (R. 569). Plaintiff argues the change in exertional level was because:

> By 1/29/02 there was enough information available regarding Ms. Bush's right knee that Dr. Given restricted Ms. Bush to sedentary activity. This assessment was based upon the more recent treatment information including the MRI of the right knee rather than any real change in symptoms.

(Plaintiff's brief at 12-13). Dr. Given, however, does not mention the MRI of the right knee in the opinion at issue. The only physical impairment he lists as a basis for his assessment is "back pain." Dr. Given found she could infrequently climb, stoop/bend, kneel, crouch, crawl, and squat, which the undersigned finds is not consistent with a finding of a disabling knee impairment. He also

22

opined she could use her feet and legs for repetitive movements such as in pushing or pulling leg/feet controls, which the undersigned also finds inconsistent with disabling knee pain. He found she would not need any assistive device. He did not indicate she needed to elevate her feet. He found "The specific barriers to employment from a medical standpoint" would be "depression" and "education." There is no support in the record for Dr. Given's opinion that Plaintiff was limited to sedentary work due to her back pain.

For all the above reasons the undersigned finds there is substantial support in the record for the ALJ's rejection of Dr. Given's opinion that Plaintiff could work only at the sedentary level.

### D. The Grids

Plaintiff next argues that, as a corollary to No. 3, the ALJ failed to find that she met the Grids ("The Medical-Vocational Guidelines") at age 50. Because the undersigned has already found substantial evidence supports the ALJ's determination regarding Dr. Given's opinion that Plaintiff was limited to sedentary work, he does not reach the merits of this argument. If, on remand, the Commissioner determines Plaintiff could only work at the sedentary level, she would be considered disabled at age 50 pursuant to either Rule 201.12 (if considered to have a "high school education") or 201.09 (if, as the ALJ found, she is considered to be functioning at the "limited education" level).

### E. Severe Mental Impairments

Plaintiff next argues the ALJ's finding that the Plaintiff had no severe mental impairment is not supported by substantial evidence and is in violation of 20 C.F.R. 416.927(d). Defendant contends the ALJ properly determined that Plaintiff's mental impairment was not severe. The Fourth Circuit holds:

> [A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to

23

interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984)* (*quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations* (1980) (emphasis added).

Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).

Plaintiff was originally diagnosed with and treated for depression by her family physician. In March 1999, she underwent a psychological evaluation, performed by John R. Atkinson. Dr. Atkinson noted Plaintiff had never been formally treated for a mental impairment, but was treated by her general physician, who prescribed Paxil. Dr. Atkinson found Plaintiff "somatically focused," and noted she appeared psychastenic, tense, jittery, and nervous. Her IQ, as tested on the WAIS-R, was 83-84, or "dull/normal." Personality testing was considered valid and, according to Dr. Atkinson, suggested somatic concerns, hypochondriasis, and psychophysiological disorder. Dr. Atkinson diagnosed Plaintiff with Dysthymic Disorder,[3] provisional, Undifferentiated Somatoform Disorder,[4] and Hysteroid Personality Traits. He assessed Plaintiff's GAF as 60, for moderate symptoms. He felt she would be "a very marginal candidate for any kind of competitive or consistent employment for the foreseeable future."

Dr. Atkinson completed a Psychiatric Review Technique form ("PRT"), finding Plaintiff's

---

[3]The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than nor for at least 2 years. DSM IV at page 345.

[4]The common feature of the Somatoform disorders is the presence of physical symptoms that suggest a general medical condition . . . and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder . . . . the symptoms must cause clinically significant distress or impairment in social, occupation, or other areas of functioning. In contrast to Factitious Disorders and Malingering, the physical symptoms are not intentional . . . . Undifferentiated Somatoform Disorder is characterized by unexplained physical complaints, lasting at least 6 months, that are below the threshold for a diagnosis of Somatization Disorder. Id. at 445.

degree of limitation of activities of daily living and maintaining social functioning were slight, and that she would seldom have deficiencies of concentration, persistence or pace. He also completed a Mental Residual Functional Capacity Assessment ("MRFC"), finding Plaintiff would have a "poor" ability to deal with work stresses and function independently, and a "fair" ability to follow work rules, relate to coworkers, deal with the public, interact with supervisors and behave in an emotionally stable manner.

About a year and a half later, psychologist Battisti examined Plaintiff. On this occasion, using the WAIS-III IQ test, Plaintiff's IQ was between 74-76, or at the "borderline intellectual functioning" level.[5] Personality testing results were considered invalid, but Dr. Battisti noted those same results could also be "indicative of persons expressing paranoid thinking, hostility, and poor physical health." The Beck Depression Inventory indicated a moderate range of depression. Dr. Battisti diagnosed Plaintiff with a Pain Disorder, Mood Disorder due to joint pain with Depressive Features, and Anxiety Disorder due to joint pain with Generalized Anxiety. He also assessed Borderline Intellectual Functioning and a current GAF of 55, or moderate symptoms. He found Plaintiff would have a "marked" degree of limitation of restriction of activities of daily living and "marked" difficulties in maintaining social functioning. She would "often" experience deficiencies of concentration, persistence or pace. She would be "markedly limited" in her ability to work in coordination or proximity to others without being unduly distracted by them, complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to accept instructions and respond appropriately to criticism from supervisors. The ALJ totally rejected this

---

[5]Dr. Atkinson had used the WAIS-R IQ test.

25

evaluation.

A year and a half later, Plaintiff underwent a third psychological evaluation, this time conducted by Wilda Posey. IQ scores were again in the borderline range on the WAIS-III. The Beck Depression Inventory indicated mild depression and the Beck Anxiety Inventory indicated severe anxiety. Personality testing, considered valid, indicated an individual with somatic complaints likely to be chronic, with fatigue and weakness, tending to render the individual incapable of performing even minimal expectations. The diagnosis on this occasion was Undifferentiated Somatoform Disorder, Dysthymic Disorder, and Borderline Intellectual Functioning, with a GAF of 60, again for moderate symptoms. Although Ms. Posey found Plaintiff would not be markedly limited in any area, she would have a "poor" ability to function independently and demonstrate reliability. She had no restriction of activities of daily living, mild difficulties in maintaining social functioning, and in concentration, persistence or pace, with no repeated episodes of decompensation.

There are no other psychological assessments in the record. The ALJ did not refer Plaintiff for a psychological examination, nor did he request an evaluation of the record by a State agency reviewing psychologist.

The ALJ rejected the second (Battisti) evaluation *in toto* because: 1) Plaintiff complained of "heart problems" - a claim not supported by the record; 2) the personality testing was considered "invalid;" 3) achievement testing was not commensurate with her low IQ scores; 4) IQ test results were inconsistent with Dr. Atkinson's; and 5) the diagnosis of mood and anxiety disorder appeared based primarily on Plaintiff's self-report.

The ALJ did accept Dr. Atkinson's diagnosis of Dysthymic Disorder and Undifferentiated Somatoform Disorder, but found them nonsevere. He then totally rejected Dr. Atkinson's Mental

RFC, in which he opined Plaintiff would have a poor ability to function independently, deal with work stresses, or understand, remember and carry out complex job instructions, stating those findings were inconsistent with Dr. Atkinson's findings that Plaintiff's degree of limitation of activities of daily living and maintaining social functioning were slight, and that she would seldom have deficiencies of concentration, persistence or pace.

The ALJ also totally rejected the latest mental RFC (Posey), which found that Plaintiff would have "moderate" limitations. The ALJ therefore rejected all the Mental RFC's contained in the record. "In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." Grimmett v. Heckler, 607 F.Supp. 502, 9 Soc. Sec. Rep. Serv. 771 (D.C.W.Va. 1985).

The undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff did not have any severe mental impairment. The undersigned in particular finds substantial evidence does not support the ALJ's determination that Plaintiff did not have Borderline Intellectual Functioning, either severe or non-severe. The two later IQ tests were fairly consistent (76, 75, and 74 versus 73, 83, and 76) and both indicated Borderline Intellectual Functioning. The earliest test score was about ten points higher, but the undersigned notes this was on a different version of the WAIS test.[6]  In addition, although Dr. Atkinson found Plaintiff's 83-84 IQ indicated "dull normal" intelligence, the DSM-IV does define Borderline Intellectual Functioning as "an IQ in the 71-84 range." DSM-IV, supra, at 684. This diagnosis is also consistent with Plaintiff's having repeated the first and fourth grades in school, and then having quit school in the eighth grade to take care of

---

[6]The undersigned admits to having no knowledge of whether the different tests could, without more, produce different results.

her father. Significantly, despite Plaintiff's having obtained her GED, the ALJ found she was functioning in the "limited education" range, with "marginal achievement.

As to her other alleged mental impairments, all three psychologists found Plaintiff would have limitations in her ability to perform work functions. Mr. Atkinson opined Plaintiff would have a "poor" ability to deal with work stresses and function independently, Ms. Posey opined she would have a "poor" ability to function independently and demonstrate reliability, and Mr. Battisti opined she would be "markedly limited" in her ability to work in coordination or proximity to others without being unduly distracted by them, complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors.

The ALJ rejected all of these limitations. In fact, he rejected every Mental RFC in the record, stating only: "Resolving all doubts in the claimant's favor, I find that despite any depression and somatization that is present she is capable of performing simple, routine, repetitive jobs" (R. 25). The undersigned finds, however, there is simply no "psychiatric or psychological evidence to support his position." Grimmett, supra. The only psychological or psychiatric evidence in the record indicates Plaintiff had medically determinable mental impairments that constituted more than a "slight abnormality," and that these mental impairments would cause more than a "minimal effect " on her ability to work. Evans, supra.

The undersigned also notes that the same ALJ had, in his earlier decision, found Plaintiff did have severe mental impairments (somatoform disorder and dysthymia), based only on Dr. Atkinson's evaluation. Although this decision was later vacated, the undersigned finds it at least in part supports

28

a finding that Plaintiff had severe mental impairments.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determinations that Plaintiff did not have Borderline Intellectual functioning, and that her other medically determinable mental impairments were non-severe.

## F. Mental RFC

Plaintiff next argues the ALJ failed to include specific mental limitations in the RFC, in violation of SSR 96-8p and 20 C.F.R. 416.945(c). For the same reasons the undersigned has already found substantial evidence does not support the ALJ's determination regarding the existence and severity of Plaintiff's mental impairments, he also finds substantial evidence does not support the ALJ's Mental Residual Functional Capacity Assessment.

## G. Hypothetical to the VE

Plaintiff next argues the ALJ relied upon an incomplete, inadequate hypothetical question that did not include the specific mental limitations or the need to recline and take frequent rests. Defendant contends the hypothetical question to the VE included all of Plaintiff's limitations. Because the undersigned has already found that substantial evidence does not support the ALJ's Mental RFC and or his determination that Plaintiff did not meet a musculoskeletal listing, it follows that substantial evidence also does not support his hypothetical to the VE. Additionally, despite Plaintiff's diagnosis of osteoarthritis of the knee and the ALJ's own finding that Plaintiff's osteoarthritis of the right knee was a severe impairment, the ALJ's hypothetical to the VE contained no limitations at all regarding climbing, stooping, kneeling, or squatting. The undersigned therefore finds substantial evidence does not support the ALJ's hypothetical to the VE or the VE's response thereto.

## VI. Recommendation

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be DENIED, and Plaintiff's Motion for Judgment on the Pleadings be GRANTED in part, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __17__ day of January, 2006.

JOHN S. KAULL
**UNITED STATES MAGISTRATE JUDGE**